646 So.2d 955 (1994)
Roy E. BURST, Jr.
v.
BOARD OF COMMISSIONERS, PORT OF NEW ORLEANS.
No. 93 CA 2069.
Court of Appeal of Louisiana, First Circuit.
October 7, 1994.
Rehearing Denied December 27, 1994.
*956 Joel P. Loeffelholz, New Orleans, for appellant Roy E. Burst, Jr.
Cynthia J. Thomas, New Orleans, for appellee Bd. of Com'rs, Port of New Orleans.
Robert R. Boland, Jr., Baton Rouge, for Herbert L. Sumrall, Director, Civil Service Com'n.
Before LOTTINGER, C.J., and SHORTESS and CARTER, JJ.
CARTER, Judge.
This is an appeal of a decision of the Civil Service Commission (Commission).

FACTS
Roy E. Burst, Jr. was employed by the Board of Commissioners of the Port of New Orleans (the Board) as a Facility Assistant Maintenance Manager 3 and was serving with permanent status. By letter dated May 26, 1992, over the signature of J. Michael Orlesh, Jr., Director of Corporate Affairs and Delegated Appointing Authority for the Board, Burst was advised that he was being removed from his position, effective at the close of business on June 5, 1992. As cause for his termination, the letter charged Burst with specific instances of misuse of Board property, abuse of employees, and general management failures. By letter dated June 15, 1992, Burst indicated that he wished to appeal the termination because the "information used was not based on reality, but conjecture, contrived stories, and situations" over which he had no "reasonable control."
*957 On November 2 and 5, 1992, public hearings were held before a referee appointed by the Commission. In a decision dated December 16, 1992, the referee reversed Burst's termination, finding that the charges against him were not supported by the testimony and evidence presented at the hearing. The referee ordered that Burst be reinstated to his position, effective June 5, 1992, and that he receive back pay, plus interest, subject to an offset in favor of the Board for wages earned and/or unemployment benefits received during the period of his removal. The referee also ordered that the termination letter be removed from Burst's personnel record.
On December 29, 1992, the Board filed with the Commission an application for review of the referee's decision. On March 5, 1993, the Commission granted the Board's application for review and ordered that a record and transcript of the proceedings before the referee be prepared and submitted for review. On July 22, 1993, the Commission reversed the decision of the referee, thereby upholding the termination of Burst's employment.
On August 11, 1993, Burst filed with this court a petition for appeal of the decision of the Commission. On appeal, Burst assigns the following specification of error:
The Civil Service Commission erred when, based upon a cold transcript, it made credibility and factual determinations, tried the case de novo on the record alone and reversed the referee (fact finder) on the facts by substituting its own interpretation of the facts and evidence and its own judgment for that of the fact finder when the record more than supports the fact finder's (referee) decision.

REVIEW OF THE COMMISSION'S DECISION
Under LSA-Const. art. 10, § 12(A), the State Civil Service Commission has the exclusive power and authority to hear and decide all removal and disciplinary cases, and the Commission may appoint a referee to take such testimony, hear, and decide such cases. The decision of a referee is subject to review by the Commission on any question of law or fact upon the filing of a timely application for review with the Commission. LSA-Const. art. 10, § 12(A). Civil Service Rule 13.36(f) provides that, after the Commission considers the application for review, along with the pleadings and exhibits, it may do any of the following:
1. Remand the appeal with instructions to the referee; or
2. Hold new hearings or take additional evidence or both, and render its own decision thereon.
3. Reverse or modify the Referee's decision on an issue of law.
4. Affirm the Referee's decision by denying the application for review.
5. Listen to pertinent portions of the sound recordings of the proceedings conducted before the Referee or read and review the transcript of the proceedings before the Referee, and, thereafter, reverse or modify the Referee's decision on an issue of fact, and/or take any of the actions specified in 1 through 4 above.
In Wheeler v. Department of Public Safety and Corrections, Washington Correctional Institute, 544 So.2d 66, 67 (La.App. 1st Cir.1989), this court was presented with the issue of what standard of review is applicable to the Civil Service Commission when it reviews a decision of a referee. In Wheeler, 544 So.2d at 67, the court stated as follows:
La. Const. art. 10, § 12(A) grants to the State Civil Service Commission the "exclusive power and authority to hear and decide all removal and disciplinary cases...." As an aid in the performance of its constitutional "power and authority," the Commission is authorized to appoint "a referee, with subpoena power and power to administer oaths, to take testimony, hear, and decide removal and disciplinary cases." The constitution further provides that the decision of the referee is subject to review by the Commission on any question of law or fact.
The constitution does not provide for a standard of review for the Commission when reviewing decisions of a referee. *958 Appellant suggests in argument that we impose a standard of review on the Commission. However, inasmuch as the State Civil Service Commission is created by the constitution and has the authority to adopt rules which have the effect of law, La. Const. art. 10, § 10(A)(4), we conclude that the Commission is the proper party to determine if a standard of review should be applicable.
We have reviewed the Civil Service Rules and find that the Civil Service Commission has not yet promulgated a rule with regard to the Commission's standard of review when reviewing the decision of a referee. Thus, as we stated in Wheeler, we are not the proper party to determine whether a standard of review should be applicable when the Civil Service Commission reviews a decision of a referee.
The final decision of the Commission is subject to review by the court of appeal on any question of law or fact. LSA-Const. art. 10, § 12(A). A reviewing court should not disturb the factual findings made by the Commission in the absence of manifest error. Walters v. Department of Police of City of New Orleans, 454 So.2d 106, 113 (La.1984); Greenleaf v. DHH, Metropolitan Developmental Center, 594 So.2d 418, 427 (La.App. 1st Cir.1991), writ denied, 596 So.2d 196 (La.1992). In Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993), the court indicated that, in order to reverse a factual finding made by the trier of fact:
(1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
(2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
A permanent classified civil service employee cannot be disciplined without cause. LSA-Const. art. 10, § 8. Cause exists whenever the employee's conduct is detrimental to the efficient and orderly operation of the public service that employed him. Greenleaf v. DHH, Metropolitan Developmental Center, 594 So.2d at 427; Claverie v. L.S.U. Medical Center in New Orleans, 553 So.2d 482, 487 (La.App. 1st Cir.1989). An appellate court should not reverse the Commission's determination of the existence of cause for a disciplinary action unless the decision is arbitrary, capricious, or an abuse of discretion. Walters v. Department of Police of City of New Orleans, 454 So.2d at 113. Generally, an abuse of discretion results from a conclusion reached capriciously or in an arbitrary manner. Torrance v. Caddo Parish Police Jury, 119 So.2d 617, 619 (La.App. 2nd Cir.1960). The word "arbitrary" implies a disregard of evidence or of the proper weight thereof. A conclusion is "capricious" when there is no substantial evidence to support it or the conclusion is contrary to substantiated competent evidence. Coliseum Square Association v. City of New Orleans, 544 So.2d 351, 360 (La.1989).
At the hearing of this matter, the appointing authority submitted into evidence a "Standards of Conduct Policy" for the Board and a policy approval statement, signed by Burst on October 12, 1989, verifying that he received a copy of the policy. The policy includes a statement, which reads as follows:
The Board of Commissioners of the Port of New Orleans is committed to a standard of excellence in the workplace. Certain activities, if engaged in while on the job, or on Board property, or which adversely affect job performance even though committed outside the scope of employment, constitute an impairment to delivery of services provided by this Board.
The activities outlined ... in ... this policy are prohibited. If an employee is found participating in any of those activities, he or she will be subject to disciplinary action, including termination and in some cases may be subject to criminal prosecution or civil liability.
The policy then sets forth conduct which is subject to disciplinary action and includes the following:
A. Leave Abuse
B. Unauthorized Leave or Absence from Post of Duty
C. Insubordination/Failure to Follow Direct Orders

*959 D. Improper Performance of General Duties
E. Falsification of Records or Documents
F. Theft or Misuse of Board Property[1]
G. Fighting or Unruly Behavior on Premises[2]
H. Sexual Harassment
I. Possession or Use of Contraband Items
J. Possession of Unauthorized Dangerous Weapons on Board Premises
K. Committing Other Illegal Acts
The policy further provides that managers, such as Burst, and supervisors are responsible for monitoring staff compliance with the policy, investigating and documenting offenses, coaching and counseling employees, and reporting violations in writing to the Division Director.
At the hearing, Anthony Degrado testified regarding various allegations of Burst's "misuse of Board property." Degrado stated that on one occasion he accompanied Burst to Home Depot for a personal errand on Board time. According to Degrado, Burst purchased siding at Home Depot, and the siding was loaded into the back of a Board truck. Degrado and Burst then brought the siding to Burst's home where the siding was unloaded. Degrado also indicated that, pursuant to instructions from Burst, he and Joseph Darensbourg once picked up a load of rocks located on or near Board premises, loaded the rocks into a Board truck, and subsequently delivered the rocks to Burst's residence.[3] According to Degrado, Burst also once instructed him to take a chair to Armand Rodriguez and to have him strip the chair.
Degrado also testified with regard to Burst's alleged "unruly behavior" while on Board premises. According to Degrado, on one occasion, while he was standing on a ladder painting the outside of a building, Burst slammed a window down on his fingers. Degrado stated that Burst's actions were very dangerous because he easily could have fallen, and he noted that Burst laughed while doing this. Degrado also recalled an incident where Burst stepped on his toes, causing his toes to be "black and blue" for at least two weeks. Apparently, Burst did this when employees failed to wear the required steel-toed shoes. Degrado also testified that Burst once wrapped an electrical strap around his neck and pulled it tight, which frightened Degrado.
In making its determination, the Commission disregarded the testimony of Anthony Degrado because the referee determined that he was not a credible witness. However, much of Degrado's testimony was corroborated by other witnesses.
Mark Duplessis testified that he worked under Burst for approximately two and one-half years. Duplessis stated that he once witnessed Joseph Darensbourg being lifted in a man-lift bucket, while Burst was at the controls in the truck. According to Duplessis, Burst suddenly hit the override switch, causing the bucket to tilt forward and requiring Darensbourg to hold on to the sides while he yelled for Burst to stop it. Duplessis found Burst's actions to be very dangerous, but he stated that Burst was "having fun laughing." Duplessis also described an incident where Burst contemplated turning on a *960 water valve while Darensbourg was in the bucket changing a sprinkler head.
Duplessis recalled other incidents involving Burst's alleged "unruly behavior." On several occasions, he saw Burst put Darensbourg's cap into a toilet (apparently to express his dissatisfaction with Darensbourg's failure to comply with the safety requirement that the employees wear hard hats)[4] and witnessed Burst step on the toes of employees who were not wearing the required steel-toed shoes. Duplessis stated that Burst had once slammed a window down on Degrado's fingers, when Degrado was standing on a ladder painting the outside of a building. Duplessis indicated that Degrado screamed and told Burst to open the window and that Burst was smiling as he did this. Additionally, Duplessis stated that Burst often pulled his "pigtail" and made comments about it, until one day when Duplessis finally slapped Burst's arm away and told Burst to get away from him.
Joseph Darensbourg testified that Burst once instructed him and Degrado to load some rocks and take them to Burst's residence, which they did in a Board vehicle. When asked about the bucket incident, Darensbourg indicated that Burst had tipped the bucket, "but not enough to throw [him] out." Darensbourg stated that, on one occasion, Burst asked him to "hassle," but he told Burst that he had a hurt leg. Nonetheless, Burst grabbed Darensbourg, threw him down, and began wrestling with him, causing Darensbourg to aggravate a previous leg injury. As a result, Darensbourg missed several weeks of work.
Robert Hamrick testified that Burst once brought a personal television set onto Board premises to be checked by Hamrick. On another occasion, Burst brought a dirt bike for Hamrick to paint, which Hamrick painted on his own time and with his own paint, but on Board premises.
Armand Rodriguez testified that Degrado once brought a chair to him and told him that Burst wanted the chair stripped. Although the chair was Burst's personal property, Rodriguez stated that he did the stripping on Board premises with Board materials. According to Rodriguez, Burst never told him not to work on the chair on Board time.
At trial, the parties stipulated that Alphonse Richard once brought a refrigerator and microwave onto Board premises for the employees' use and that he told Burst that the items had been purchased for a couple of hundred dollars from a friend who had "cacheed" them, implying that the items were stolen property. Burst testified that he allowed the items to remain on Board premises.
Cathy Schweitzer, Administrator of the Management Office for the Port of New Orleans, personnel director of the Board, and one of the delegated appointing authorities for the Board, testified that she assisted in the investigation of Burst's activities. She indicated that many of the employees were afraid to get involved with the investigation. Schweitzer stated that the Board has a standards of conduct policy and that Burst had received a copy of the policy and, as a manager, was responsible for enforcing it.
Schweitzer explained that managers, such as Burst, are charged with the responsibility of managing Board assets and are responsible for providing a safe and wholesome work environment for employees. She indicated that managers are not to put employees at risk. According to Schweitzer, the Board's policy addresses any unruly behavior and that Burst's horseplay, pranks, and misconduct fall into this category. Schweitzer further explained that this type of conduct constitutes an impairment to state service and that the Board's policy expressly indicates that such violations are tantamount to impairment *961 of state service. Schweitzer stated that many of the instances involving Burst took place on Board time when the employees should have been working.
Mark Williams, Internal Audit Director for the Port of New Orleans, testified that most of the employees were afraid to speak up during the investigation of Burst's activities in fear that they might be physically harmed or lose their jobs. Williams stated that, as part of the investigation, he conducted surveillance of Burst's employees. Williams' notes indicate that the employees were recording hours on their time sheets which they had not actually worked. According to Williams, Burst was answerable to management for these discrepancies.
Russell W. Honsinger, Director of Finance and Accounting for the Port of New Orleans, testified that Burst is responsible to management for the accuracy of his employees' time sheets and work records, even if he delegates that responsibility to his two superintendents. Honsinger also criticized Burst's bringing personal items, such as a microwave oven, refrigerator, and television set, onto Board premises, noting that this creates a risk of liability for the Board.
Patrick J. Gallwey, Director of Planning and Engineering for the Port of New Orleans, testified that he had been Burst's supervisor. Gallwey indicated that he considered Burst's actions to be an impairment to state service. He also stated that it is intolerable to use Board property for personal gain. According to Gallwey, Burst abused his position in allowing all of the described incidents to occur.
In reaching its decision, the Commission made many factual determinations and concluded that there was cause for disciplinary action against Burst, i.e. his conduct was detrimental to the efficient and orderly operation of the Board. See Greenleaf v. DHH, Metropolitan Developmental Center, 594 So.2d at 427; Claverie v. L.S.U. Medical Center in New Orleans, 553 So.2d at 487. After a thorough review and evaluation of the entire record, we are convinced that a reasonable basis exists for the Commission's factual findings, and we cannot say that the findings are clearly wrong. Furthermore, we find that the record does not reflect arbitrary or capricious action on the part of the Commission in concluding that there was cause for the removal of Burst from his position. Accordingly, the decision of the Commission is affirmed.

CONCLUSION
For the foregoing reasons, the decision of the Civil Service Commission, removing Burst from his position, is affirmed. All costs of this appeal are assessed against Burst.
AFFIRMED.
NOTES
[1] The policy states that "theft" includes, but is not limited to, stealing Board property; falsifying expense account reports; embezzlement of Board funds; taking scrap or other surplus materials belonging to the Board or others; and using Board property for personal gain.

The policy also indicates that "misuse of Board property" includes damaging Board vehicles through negligence or driving in an unsafe manner; using a Board vehicle for unauthorized purposes; committing any unsafe act which may result in property damage; gambling on premises; making personal long distance phone calls at Board expense; unauthorized use of any Board property or employee labor.
[2] According to the policy, unruly behavior or "creating a disturbance on Board premises" includes any unruly behavior which disrupts activities of the work unit. "Fighting" implies the use of force or violence and includes the use of weapons, damaging property, and endangering the life or limb of the participants or third parties.
[3] Degrado was uncertain as to the ownership of the rocks and was uncertain whether the rocks were located on Dock Board property.
[4] With regard to these incidents, Duplessis testified as follows:

Q. Okay. So, would youhave you ever seen Mr. Burst put Joe D.'s cap in the commode?
A. Yes.
Q. Do you recall when that was?
A. Not a specific date, no.
Q. Was that on Board time?
A. Yes.
Q. So, it was some time during a work day?
A. Yes. It was more or less towards the end of a work day.
Q. How would that happen? I mean, was it on more than one occasion or
A. Several occasions.