752 So.2d 357 (2000)
Ernestine JACKSON
v.
DEPARTMENT OF HEALTH AND HOSPITALS, OFFICE FOR CITIZENS WITH DEVELOPMENTAL DISABILITIES, Metropolitan Developmental Center
No. 98 CA 2772.
Court of Appeal of Louisiana, First Circuit.
February 18, 2000.
*358 Gina M. Recasner, New Orleans, Counsel for Defendant/Appellant Department of Health and Hospitals.
Roger B. Jacobs, Metairie, Counsel for Plaintiff/Appellee Ernestine Jackson.
Robert R. Boland, Jr., Baton Rouge, Counsel for Appellee Allen Reynolds, Director, Department of State Civil Service.
Before: GONZALES, FITZSIMMONS, and WEIMER, JJ.
WEIMER, J.
The Louisiana Department of Health and Hospitals (DHH) appeals a decision of the Louisiana Civil Service Commission (Commission) reinstating Ernestine Jackson to her position as a Resident Training Specialist (RTS) at the Metropolitan *359 Developmental Center (Center) in Belle Chasse, Louisiana. The Commission reviewed the record and transcript of Ms. Jackson's hearing and reversed the decision of the referee who had upheld DHH's termination of Ms. Jackson as a disciplinary measure. She had been terminated for insubordination for refusing to take a polygraph test. Finding the Commission was neither manifestly erroneous in its factual findings nor arbitrary and capricious in its determination of lack of legal cause,[1] we affirm.

BACKGROUND
Ms. Jackson was employed with DHH, Office for Citizens with Developmental Disabilities, at the Center, where a home for and services to severely developmentally disabled adults are provided. As an RTS, she was responsible for providing direct care to the facility's residents.
During August of 1995, there were allegations that one of the Center's employees verbally and physically abused and/or neglected a non-verbal resident. The Center began an investigation of the alleged incident. During the course of the investigation, several employees, including Ms. Jackson, were questioned. Ms. Jackson denied having any knowledge of the alleged incident. Ms. Jackson was not suspected of being the party responsible for the abuse or of actually having witnessed the abuse.
When the investigation reached a stalemate, Dr. Robert Sanders, Center Administrator and Ms. Jackson's appointing authority, decided to order several employees to submit to a polygraph test. Dr. Sanders, in conjunction with DHH legal counsel George Allspach, arranged to have Don A. Zuelke, a polygraphist, perform the tests on November 30, and December 1, 1995, at the Center.
At approximately 3:00 p.m. on November 30, 1995, Ms. Jackson was called out from a class and shown a memorandum from Dr. Sanders ordering her to appear for a polygraph test at 6:00 p.m. that same evening. Ms. Jackson signed the memorandum, but testified she never received a copy of it.
At 6:00 p.m., Ms. Jackson presented herself to Mr. Zuelke. Upon seeing the polygraph equipment (which she referred to as "wires" in a "suitcase"), she became extremely nervous. Ms. Jackson has maintained throughout these proceedings that her anxiety arose from an incident in the 1970s when she was hooked up to various wires in a hospital and she suffered a miscarriage. Although Ms. Jackson testified she told Mr. Zuelke of her fears, he denied this fact. Mr. Zuelke testified when Ms. Jackson stated to him she was not going to take the polygraph test, he procured her signature on a form which read "refused to take test." Both Ms. Jackson and Mr. Zuelke agree that their meeting did not last longer than five minutes. Thus, Mr. Zuelke did not perform a pre-examination interview of Ms. Jackson as he did with the other employees who reported to take the test. Some of the employees who reported to Mr. Zuelke were excused from taking the test after he conducted a pre-examination interview.[2]
*360 No one at the Center made further contact with Ms. Jackson concerning the polygraph test. Thus, there was no other attempt to obtain her polygraph test prior to the closing of the investigation of the alleged abuse incident.
Ms. Jackson was next contacted by the appointing authority by letter dated February 1, 1996, in which she was advised her termination was contemplated in light of her insubordination in refusing to take the polygraph test. She appeared at a pre-deprivation hearing at which Dr. Sanders and Mr. Allspach were both present. She repeated her fears concerning being connected to the "wires" of the polygraph, but offered to take the test at that time. The offer was declined by the appointing authority because the investigation had been concluded.
Thereafter, Ms. Jackson was notified by the appointing authority that her employment was terminated effective March 29, 1996, for insubordination for refusing to take a polygraph test. Ms. Jackson applied for an appeal. A public hearing was held on February 24, 1997, before a referee appointed by the Commission.
The referee decided that (1) the appointing authority had carried its burden of proving the charges in the letter of disciplinary action; (2) Ms. Jackson refused to take a polygraph test and this conduct constituted cause for disciplinary action; (3) the refusal to follow the order to take the test amounted to insubordination; and (4) insubordination was sufficient cause for termination.
When Ms. Jackson appealed to the Commission, the decision of the referee was reversed and she was reinstated to her employment. This appeal by DHH followed, with DHH assigning the following errors:
1.) The Civil Service Commission erred as a matter of law in holding that the appointing authority did not have cause when terminating appellee.
2.) The Civil Service Commission erred as a matter of law in holding that appellee's termination was unreasonable.
3.) The Civil Service Commission erred in failing to find that appellee's actions constituted insubordination and impaired the efficiency of the agency.
4.) The Civil Service Commission erred in finding that appellee was unaware that she had to follow a lawful directive and that one of the goals of ordering appellee to submit to a polygraph exam was to see if she would comply with the appointing authority's order.

DISCUSSION
As a threshold issue, DHH maintains this court must give great weight to the factual conclusions of the referee. The jurisprudence cited by DHH in support of this proposition is inapposite.[3] However, the case of Burst v. Board of Commissioners, Port of New Orleans, 93-2069 (La. App. 1 Cir. 10/7/94), 646 So.2d 955, is applicable. Burst involved the Commission's reversal of a decision of a referee. The employee urged that the Commission erred when, based upon a cold transcript, *361 it made credibility and factual determinations, tried the case de novo on the record alone, and reversed the referee on the facts by substituting its own interpretation of the facts and evidence and its own judgment for that of the fact finder. This court rejected that argument and held that the Commission, not this court, was constitutionally authorized to establish a standard of review for it to follow concerning its review of a referee's decision. Id., 93-2069 at 4-5, 646 So.2d at 958. We have reviewed the Civil Service Rules and find that the Commission has not yet promulgated a rule that would call for the Commission to accord deference to the referee when reviewing the decision of the referee.[4]
Thus, as noted previously, we will adhere to the manifest error standard of review in considering the factual determinations of the Commission that led to reversal of the decision of the referee. (See Footnote 1.)

Assignment of Error No. 1:
DHH asserts the Commission erred in concluding the appointing authority did not have cause to terminate Ms. Jackson's employment. DHH reasons that because she was ordered to take the test and did not take the test on the date ordered, her conduct prevented the agency from concluding its investigation into client abuse and was thus detrimental to the efficient and orderly operation of the Center. Further, DHH asserts it was important that she take the test when ordered because her testimony could have been tainted if she was given advance notice of the scheduling of the test.
These assertions are not consistent with the record. The record reveals Ms. Jackson was never allowed to take the polygraph test, even after she offered to do so in February of 1996. The reason the appointing authority gave for rejecting her offer was that the investigation had been completed. Thus, Ms. Jackson's refusal to take the test did not prevent the Center from completing the investigation. Additionally, the argument that an employee's testimony will be tainted if she is given advance notice of the date of the polygraph test was voiced by Mr. Allspach, DHH's legal counsel. Mr. Zuelke, the polygraphist, who would be more knowledgeable about what will or will not taint the test results, did not testify regarding whether the results would be tainted.
Concern over possible tainting of the testimony is questionable in light of the facts surrounding the investigation. The record reveals that Ms. Jackson and other employees had been interviewed concerning the investigation months before the polygraph tests were scheduled. If employees were to conspire among themselves concerning the testimony they would give about the incident, that could have been accomplished prior to the scheduling of the polygraph tests.
"Cause" for the dismissal of a person who has gained permanent status in the classified civil service has been interpreted to include conduct prejudicial to the *362 public service in which the employee in question is engaged or detrimental to its efficient operation. Walters v. Department of Police of City of New Orleans, 454 So.2d 106, 113 (La.1984). The Commission has a duty to decide independently from the facts presented whether the appointing authority has good or lawful cause for taking disciplinary action and, if so, whether the punishment imposed is commensurate with the dereliction. Id. This court should not reverse a Commission conclusion as to the existence or absence of cause for dismissal unless the decision is arbitrary, capricious or an abuse of the Commission's discretion. Id. In judging the commission's exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, this court may not modify the Commission's order unless it is arbitrary, capricious or characterized by abuse of discretion. Id. at 114.
Thus, we are not convinced that the Commission committed an error of law, as DHH asserts, or abused its discretion in determining the appointing authority lacked cause to terminate Ms. Jackson's employment based on her refusal in November of 1995 to take the polygraph test. There is no merit to Assignment of Error No. 1.

Assignment of Error No. 2:
DHH argues that because Ms. Jackson failed to take the polygraph test and follow a reasonable order given as part of an investigation into client abuse, the appointing authority's decision to terminate her employment was reasonable and the Commission erred in holding termination of employment was unreasonable.
The referee's findings of fact that must be examined concerning this issue include the following:
6. [Ms. Jackson] reported to the test site ... and informed the person who was to administer the test that she did not want to take the test.
7. [She] was advised that failure to take the test might result in disciplinary action. [Ms. Jackson] continued to say that she did not want to take the test and she signed a statement to that effect.
8. [She] and one other person on the Director's list refused to take the test. They were both terminated.
9. At a pre-termination hearing, [Ms. Jackson] stated that she would take the test if she had too. However, by that time the investigation of the incident had been completed.
10. [Ms. Jackson] was not suspected of resident abuse. She was required to take the test because it was believed that she might have some knowledge which would have aided in the investigation.
The Commission made the following factual findings that are in addition to, but not contradictory of, the referee's findings:
The reason given at trial [i.e., hearing before the referee] by [Ms. Jackson] for refusing to sit for the examination was fear of the effect upon her of the wires of the polygraph machine based upon an incident in the past where she perceived an adverse physical and emotional affect [sic] caused by a similar machine. The nature of [her] fears were those that should have been capable of being removed with brief discussion about those fears and an explanation of the polygraph machine and its purposes. Neither the examiner nor the appointing authority made any attempt to identify the reasons for the refusal to take the exam either at [her] initial presentation before the examiner or prior to the conclusion of the investigation. If there was value in obtaining the results of the exam, there was value in attempting to find out why the [Ms. Jackson] did not want to take the exam. If obtaining the results was the only reason for ordering [her] to sit for the polygraph exam, something more than a perfunctionary *363 [sic] attempt to obtain the results would have been made.
In Creadeur v. Department of Public Safety, Division of State Police, 364 So.2d 155 (La.App. 1 Cir.1978), this court held that as a general rule a police officer may be required to take a polygraph or similar test where the request is reasonable and bears sound relationship to police work, lawful departmental policy or interdepartmental matters. However, in Creadeur, we cautioned that the general rule is not unqualified and is subject to the exception that one is not required to submit to an order to take a polygraph test which is unreasonable or when a legitimate reason exists for refusal to obey such an order. Id. at 157. We see no reason why the same considerations should not apply also to an RTS and the Center such as are involved in the instant case.
We know of no Louisiana judicial decisions explicitly stating that non-law-enforcement civil servants may be required to take a polygraph test. However, weighing the competing equities of the parties in the instant case, we believe such a requirement is appropriate depending on the circumstances of the individual case. The position of RTS is one that entrusts the employee with a special duty: tending to individuals who cannot fend for themselves and who often may not be able to verbalize what has happened to them. When an agency such as the Center suspects that an RTS mistreated a person, or knows of such mistreatment, the agency has few tools at its disposal to determine what happened. As a practical matter, the polygraph test is one of the few available tools. Preventing the use of a polygraph test would increase the risk of harm to the vulnerable residents of the Center. However, the polygraph test is imperfect, and where there is a legitimate reason for refusal to take the test, the employee should not be forced to make the impossible choice between submitting to the test or facing termination.[5]
In the instant case, reasonableness is a two-edged sword; it entails the reasonableness of the appointing authority in ordering the test and the reasonableness of the employee in refusing to take the test. We interpret the Commission's decision as concluding that the appointing authority may have been reasonable in ordering the polygraph test to further its investigation; however, the appointing authority and/or the polygraphist were unreasonable in failing to allay the employee's fears and failing to assist her in reaching the conclusion that the test would not be injurious. We also interpret the Commission's decision as concluding that, considering her past experiences, Ms. Jackson was not unreasonable in voicing her initial refusal to take the test. Thus, the Commission was not manifestly erroneous in its findings that Ms. Jackson's fears were not unreasonable, given her past experiences, a matter that the referee did not address. This assignment of error is without merit.

Assignment of Error No. 3:
In arguing this assignment of error, DHH asserts Ms. Jackson's refusal to take the polygraph test was "adamant, unjustified, and unwarranted" and thus constituted insubordination which warranted termination of employment. Our discussion of the reasonableness of Ms. Jackson's fears and motives for her conduct is dispositive of this issue. Because the Commission was not manifestly erroneous in determining Ms. Jackson reasonably refused to take the test when it was initially ordered, and the appointing authority and/or the polygraphist unreasonably neglected to investigate her motives and allay her fears, Ms. Jackson was not insubordinate. This assignment of error is without merit.

*364 Assignment of Error No. 4:

DHH's final assignment of error is two-fold: first, that the Commission erred in finding Ms. Jackson was unaware that she was required to follow a lawful directive; and second, that the Commission erred in finding that one of the goals of ordering Ms. Jackson to submit to the polygraph test was to see if she would comply with the appointing authority's order.
We will not belabor either point. Even if the Commission erred in those two findings, such error is harmless, for the record amply supports the Commission's decision that the appointing authority was without cause to terminate Ms. Jackson's employment.
Concerning Ms. Jackson's knowledge of the need to follow a lawful directive, our reading of the record reveals that Ms. Jackson was not the most articulate witness. It is difficult to discern from her testimony what she knew or did not know concerning her rights and obligations as a civil service employee.[6]
Clearly, the record reveals Ms. Jackson was not knowledgeable about polygraph tests in general and polygraph equipment in particular. However, she had a reason for refusing to take the polygraph test. Whether her reason was realistic or not can be debated. Regardless, considering our conclusion that the Commission was not manifestly erroneous in finding Ms. Jackson was reasonable in refusing to take the test, her knowledge of her obligations as an employee is immaterial to the outcome of this case.
Concerning the Commission's conclusion that the appointing authority used the polygraph test to determine whether Ms. Jackson would comply with an order, the record reveals reasonable support for this conclusion. Although the appointing authority asserts the information from Ms. Jackson was critical to its investigation, we note the investigation was completed without her taking the polygraph test; she was only a possible witness to a statement made by another employee; and she was not accused of abusive conduct or of witnessing abusive conduct.
Nevertheless, even if the Commission ascribed an ulterior motive to the appointing authority, such a conclusion is also immaterial. It was reasonable for the appointing authority to order the polygraph test when the investigation reached a stalemate. However, the Commission was not manifestly erroneous in determining the appointing authority's action became unreasonable when it proceeded to discipline Ms. Jackson for her legitimate refusal to take the test.
This assignment of error is without merit.

CONCLUSION
We share the concern of DHH which expressed an interest in preventing abuse of the infirm and the need to discipline employees who refuse to cooperate in investigations. In cases such as the instant one, our concern also must be with balancing protection of the infirm and the agency's obligation to fully investigate allegations of abuse with the consideration that one may decline an unreasonable order to submit to a polygraph and one may offer a *365 legitimate reason for refusing. Ordinarily the scales will tip in favor of concern for the infirm and the obligation to submit to a polygraph test. For those state patients in their own infirm world of body and mind, safety is dependent solely on the day to day caregivers. The actions of caregivers must be held to the highest standard; their actions, knowledge, and veracity may be, and should be, challenged whenever necessary for patient safety. However, based on the facts of this particular case, there are factors that mitigate in favor of Ms. Jackson. Those factors include 1) she was not accused of abuse or witnessing abuse, 2) the length of time between the request to take the polygraph test and a follow-up by the appointing authority was excessive,[7] 3) the appointing authority failed to adequately ascertain why she initially refused to be tested, 4) the appointing authority failed to attempt to allay her fears of the test, and 5) the investigation was completed without the necessity of her taking the test.
Accordingly, we affirm the decision of the Commission, and we assess DHH with costs of this appeal in the amount of $638.00.
AFFIRMED.
FITZSIMMONS, J., concurs in the result.
NOTES
[1] The standards of review to be applied by this court in reviewing Commission decisions are jurisprudentially well established. In civil service disciplinary cases, an appellate court is presented with a multi-faceted review function. When reviewing the Commission's findings of fact, the appellate court is required to apply the manifestly erroneous or clearly wrong standard of review. Bannister v. Department of Streets, 95-0404, p. 8 (La.1/16/96), 666 So.2d 641, 647. However, in evaluating the Commission's determination as to whether the disciplinary action taken by the appointing authority is based on legal cause and commensurate with the infraction, the reviewing court should not modify the Commission's order unless it is arbitrary, capricious, or characterized by abuse of discretion. Id.
[2] One other employee, Sallie Burras, refused to take the polygraph test. She and Ms. Jackson were the only employees disciplined (both with employment termination) despite the fact that two of the employees who took the polygraph had negative test results. Ms. Burras also appealed to the Commission, which reversed the decision of the referee and reinstated her to her former position. DHH's appeal of that matter is presently pending before another panel of this court as Sallie Burras v. DHH, Metropolitan Development Center, Docket # 98 CA 2920.
[3] DHH cites Licausi v. Department of Health and Human Resources, 458 So.2d 148, 151 (La.App. 1 Cir.1984); however, that case involved a decision of the Commission which affirmed the decision of the referee. The case of Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), 666 So.2d 612, 615, was not a civil service case. Finally, Marcantel v. Department of Transportation and Development, 590 So.2d 1253, 1256 (La.App. 1 Cir. 1991) called for determination of a procedural issue, one involving a determination of the sufficiency of an allegation rather than a factual finding. Thus, in Marcantel, the deferential standard of review afforded to factual findings was inapplicable to this court's review of the referee's decision for legal error.
[4] Civil Service Rule 13.33(b) specifies that final decisions of a referee shall be subject to review as is provided in Rule 13.36. The language pertinent to the Commission's role in reviewing the referee's decision is in Rule 13.36(f):

After consideration of the application for review, along with the pleadings and exhibits..., the Commission may:
1. Remand the appeal with instructions to the referee; or
2. Hold new hearings or take additional evidence or both, and render its own decision thereon.
3. Reverse or modify the Referee's decision on an issue of law.
4. Affirm the Reveree's decision by denying the application for review.
5. Listen to pertinent portions of the sound recordings of the proceedings conducted before the Referee or read and review the transcript of the proceedings before the Referee, and, thereafter, reverse or modify the Referee's decision on an issue of fact, and/or take any of the actions specified in 1 through 4 above.
[5] Similar thoughts were expressed by Civil Service Commission Referee Robert J. Collins in Ball, et al. v. Department of Health and Hospitals-Northwest Louisiana Developmental Center, consolidated docket numbers 12693, S-12694, and S-12695.
[6] We note the existence of LSA-R.S. 37:2848, contained in the Polygraphist Act, which provides in part:

The board may refuse to issue, or may suspend or revoke a certificate on any one or more of the following grounds:
(a) Failure to inform the person to be examined as to the nature of the examination.
(b) Failure to inform the person to be examined that his participation in the examination is voluntary, and that the refusal to submit to a polygraph shall not be an inference of guilt, nor shall it be cause or justification for termination of employment within the meaning of any law relating to unemployment compensation.
We also note the Center did not have a written policy statement concerning polygraph examinations.
[7] If the information sought by the appointing authority was critical, the two month delay in following up Ms. Jackson's refusal to take the test is inexplicable.