DANIEL L. DYSART, Judge.
| ¶ Roderick E. Parker appeals the ruling by the Plaquemines Parish Civil Service Commission terminating his employment. For the following reasons, we affirm in part, reverse in part, and remand.
FACTS AND PROCEDURAL HISTORY:
Roderick E. Parker (“Parker”) was a permanent employee of the Plaquemines Parish government, specifically, a rescue boat captain for the Plaquemines Port Harbor & Terminal District.
On October 7, 2011, at 11:58 p.m., Parker telephoned his immediate supervisor, Marine Inspector Donald Durr (“Durr”), to tell him that he was sick and would not report for duty the next morning at 5:30 a.m. Durr did not answer the phone, so Parker left a message. Parker did not report for duty on October 8, 2011. Testimony was given that Parker had an obligation to notify Durr’s supervisor and that Parker should have notified the crew he was replacing and/or his crewmate out of common courtesy. Parker denies any such rule existed. 12Parker admitted that he did attend his son’s football game the morning of October 8, and although he is one of the team’s coaches, he did not coach that day.
On October 9, 2011, Parker reported for duty. On that day, Durr went to the dock and located Parker reclined in his truck, wearing a t-shirt and work-issued pants. According to Parker, he explained to Durr that he had been washing the boat with Don DiCarlo, the engineer. Parker claimed that it was acceptable to remove his work-issued shirt when performing such duties.
After calling Parker onboard, Durr asked him for a doctor’s note, which Durr explained was requested by Durr’s supervisor, John Pennison, the port manager. Parker admitted that he became angry because everyone else was allowed to fax the note to “Ms. Karen.” Parker testified that he believed he was being harassed. He also admitted that he had the doctor’s note in his truck, but refused to retrieve it for Durr. He admitted that he called Durr a coward, but denied cursing him. Durr left the boat and returned later that morning with Pennison and a sheriffs deputy. Parker was asked to leave the premises. He refused to sign the notice of suspension presented by Pennison. Parker denied making verbal or physical threats toward Durr.
Don DiCarlo (“DiCarlo”), also a rescue captain with the Plaquemines Port Authority and Terminal District, was on duty the *115 morning of October 9, 2011.[1] His duties that day were to clean the boat, engine room and monitors and get the |sboat ready for the next hitch. Parker was his captain. When Parker arrived at the boat at 5:30 a.m., he told DiCarlo that Durr had looked for him at the ball park the day before. DiCarlo testified that at 8 a.m., he was washing the boat and Parker was sleeping in his truck. Durr came aboard and asked DiCarlo if Parker was helping to clean the boat. DiCarlo replied, “no.” When Parker came aboard, Durr questioned him about not wearing his uniform shirt, to which Parker responded, “it must be f.. .ing with Rod day.” At that point, DiCarlo left the wheelhouse room and went out on the deck to continue hosing. Parker and Durr remained in the wheelhouse for about ten minutes. When they came onto the deck, DiCarlo heard Durr ask Parker, “Did you just call me a f.. .ing faggot?” Parker confirmed what he said, and added, “You a f.. .ing coward. You don’t want to talk to me like a man you a coward.” DiCarlo and Durr left the boat. Durr made a phone call, and said he would return. Parker yelled out to Durr, “I got something for you. I got something for /all, all of y’all.”
Later that morning, Parker and DiCarlo called dispatch to say they were leaving the dock to go to a Coast Guard inspection. Pennison radioed back to the men telling them not to leave the dock until further notice. They docked the boat and DiCarlo got off. About 45 minutes later, Pennison, Durr and a sheriffs deputy arrived. Pen-nison asked Parker to exit the boat, and they spoke in the parking lot. DiCarlo did not hear the conversation.
|4On cross-examination, Parker asked DiCarlo how he could have seen him sleeping in his truck with tinted windows from 25 feet away. DiCarlo responded that the window was down.
Durr testified that as a marine inspector he is the supervisor of all rescue captains and deckhands. He testified that the rule is if an employee is going to miss work, he must notify him. If no contact was made with Durr, he was to call Pennison, the port manager. Contacting his co-workers on the outgoing shift would be a courtesy, but not a requirement.
Durr testified that he did not hear the call from Parker at 11:58 p.m. on October 7, 2011, but after receiving a call from the outgoing crew that Parker had not reported for duty, Durr noticed that Parker had left a message at midnight stating that he was at the medical center and would not be at work the morning of October 8. Durr asked the captain from the previous shift to work a double shift until Durr could get someone to relieve him.
Around 10 a.m., Parker called Durr and told him he would not be at work because he was sick. Durr told Parker to get a doctor’s note because of the late notice for missing work. A short time later, as Durr was traveling to the port office with Penni-son, his phone rang again. He could see on his phone screen that the call was from Parker. He could hear Parker talking, and from the conversations he could hear, Durr realized that Parker was at a football game. Parker’s phone had been inadvertently dialed without Parker’s knowledge. Durr and Pennison traveled to the ball park in Port Sulphur. They saw Parker’s truck and then confirmed with |fia former port employee that Parker was there *116 coaching a game. They did not personally see Parker at the ball park.
The next day, Durr went to Venice in the normal course of his day. He had been told the previous day by Pennison to get the sick leave note from Parker. Durr explained that normally there is an aluminum box in which all paperwork is placed, e.g., captain’s log, engineer’s log, doctor excuses. However, because Pennison believed that Parker had been at a football game after calling in sick, Pennison instructed Durr to pick up the note personally. As he approached the boat, he passed Parker’s vehicle and saw him reclining in the driver’s seat. He could see DiCarlo on the boat with soap and a brush. He asked DiCarlo if he was washing the boat by himself, to which DiCarlo replied, ‘You see it.”
While DiCarlo and Durr were speaking in the wheelhouse, Parker walked in wearing a t-shirt. Durr told Parker that he was out of uniform. Durr explained that there was a rule that port personnel wear collared shirts while on duty, unless they are washing the boat or performing mechanical work. In those instances, they are allowed to wear t-shirts that have the port logo on the front and back. Parker’s t-shirt was not a work-issued shirt. Durr said Parker started cursing and accusing him of harassment. Durr asked Parker for his doctor’s note, but Parker refused to give it to him. Parker told him he would fax it to “Karen” like everyone else. Durr explained that some people do fax notes, but Durr was specifically told by Pennison to get it from Parker. When Parker continued cursing and calling Durr a “f.. .ing fagot,” Durr left the boat and called Penni-son.
| f,Pennison told Durr he was coming to Venice, which was a one and a half hour trip. The men met at a convenience store, discussed the situation, wrote up paperwork detailing the incident, and called a deputy sheriff to accompany them to the dock. Durr explained that this was standard operating procedure when there was conflict with a disgruntled employee, something that had only happened on three occasions since Durr became a marine inspector. After arriving at the dock, Penni-son went on board and asked Parker to come to the parking lot. He explained to Parker that he was being suspended pending a further investigation. Durr stated that Parker was argumentative, but did not curse Pennison. The sheriffs deputy asked Parker to leave the premises as instructed. Parker left in his truck with the deputy following. Durr said he recommended that Parker be terminated, and Pennison concurred.
On cross-examination, there were numerous questions asked by Parker of the witness to which the appointing authority’s attorney objected. Parker tried to establish that it was permissible to wear any t-shirt when washing or doing mechanical work on the boat. Durr disagreed, stating that an employee was to wear either his collared, light blue work shirt, or a t-shirt with the port logo on it. Durr explained that this was policy because the port personnel were working at a Coast Guard station by permission, and port personnel needed to be identifiable as port personnel. Parker insisted that other people were allowed to wear non-port t-shirts to work on the boat, but that he was being singled out.
17John Pennison, the port manager, testified that he is responsible for all day-today operations of the port. On the morning of October 8, 2011, he and Durr traveled together to the port office on the east bank of Plaquemines Parish. During the trip, Durr told him that Parker had called him at 11:58 p.m. the evening before and had left a message that he would not re *117 port on the morning of October 8 due to illness. Durr told Pennison that Parker had not tried to contact anyone else about his absence. Durr explained that he had made numerous calls to Parker, and had left voicemail messages. During the ferry ride to the east bank, Parker called Durr and told him that he would report to work on October 9. Minutes later, Durr again received a call from Parker’s phone, but Parker was not answering on his end. The two men both listened and could tell from the conversations that Parker was at a football game. Pennison and Durr went to the ball park and learned from a third person that Parker was there. Pennison instructed Durr to get a doctor’s note from Parker when he reported for work the next day.
On the morning of October 9, Pennison got a phone call from Durr concerning Parker’s behavior. Durr explained that Parker was acting belligerent, was cursing and was threatening him. Pennison told Durr to leave the boat. He then called his human resources person and explained that he needed a deputy to accompany him to the Coast Guard station. He met Durr at a convenience store, where they filled out an employee warning form based on Parker’s insubordination and the threats he made to Durr. It was Pennison’s intention to suspend Parker pending further investigation.
IsUpon arrival at the Coast Guard station, the deputy asked Pennison to get Parker to come to the parking lot. Penni-son explained to Parker that he was being suspended indefinitely pending further investigation. Parker wanted to know what indefinitely meant. Pennison explained that Parker was being suspended, not terminated at this point, and that he had thirty days to appeal his suspension to the civil service commission. The deputy then asked Parker to leave, which he did without incident.
Pennison recommended to human resources that Parker be terminated. After a pre-termination hearing, the appointing authority notified Parker of his termination.
Parker testified on his own behalf. It was established that he had worked for Plaquemines Parish for twelve years: eight years as a tractor driver, then as an engineer/deckhand, and then as a rescue captain.
Parker testified that the letter concerning a previous incident at the parish medical center, which the parish offered to introduce into evidence, was not in his personnel file, but he admitted that the incident did occur.
Parker testified that he did not get a fair hearing before the civil service board[2] because the parish’s director of human resources was married to a gentleman who was port chairman/director. Parker asserted that this was a conflict of interest.
|flParker also disputed that it was standard operating procedure for him to notify the inspector of a time of departure. He never had to do that before the day of this incident. Parker also introduced into evidence the doctor’s note dated October 7, which he had refused to give to Durr on October 9.
Following the hearing, the Commission rendered its opinion, denying Parker’s appeal and upholding his termination. He timely appealed that decision.
*118 DISCUSSION:
Initially, we note that Parker’s brief does not comply with the Uniform Rules— Courts of Appeal in that he makes no assignments of error. However, as Parker is representing himself, we will address his complaints on appeal. See La.Code. Civ. Proc. art. 2129; Merrill v. Greyhound Lines, Inc., 10-2827 (La.4/29/11), 60 So.3d 600. Some of the issues addressed herein were raised at his hearing, but are not included in his brief.
Parker was originally suspended for: insubordination to an immediate supervisor, including, but not limited to, 1) refusal to answer questions regarding his time of departure on October 9; 2) refusal to provide a doctor’s excuse; 3) conduct unbecoming a port authority employee by arguing with a supervisor in regards to dress code; 4) threatening and cursing an immediate supervisor; 5) sleeping on the job; and 6) accusing a supervisor of administering discipline without proper authorization and in a discriminatory fashion.
Parker alleges that he was discriminated against because: 1) there was no rule requiring that he wear a specific t-shirt while on duty; 2) other people |inincluding his supervisors slept on the job but suffered no consequences; and, 3) he was not required to produce a doctor’s note directly to his supervisor upon request, but could fax the note to the port office. He claims that his supervisor, Durr, harassed him about the shirt and doctor’s note. His response was to call Durr a coward. For the first time on appeal, Parker alleges in his brief race discrimination because prior to his job with the port authority, he had worked in other departments of parish government without incident. However, during the two years he worked for the port authority, he was disciplined because he did not share ethnicity with his supervisors.
A. Standard of Review:
A permanent classified civil service employee cannot be disciplined without cause. La. Const, art. X, § 8(A). Cause exists whenever the employee’s conduct is detrimental to the efficient and orderly operation of the public service that employed him. Mathieu v. New Orleans Public Library, 09-2746, p. 5 (La.10/19/10), 50 So.3d 1259, 1262; Bannister v. Dep’t of Streets, 95-0404, p. 8 (La.1/16/96), 666 So.2d 641, 647.
On appeal to the Commission, the appointing authority must prove “by a preponderance of the evidence, that the complained of activity or dereliction occurred, and that such dereliction bore a real and substantial relationship to the efficient operation of the appointing authority.” Pearson v. Dep’t of Police, 09-0725, p. 7 (La.App. 4 Cir. 11/12/09), 26 So.3d 264, 268 (citing Cure v. Dep’t of Police, 07-0166, p. 2 (La.App. 4 Cir. 8/1/07), 964 So.2d 1093, 1094).
|nAppellate courts reviewing civil service disciplinary cases are presented with a multifaceted review function. Mathieu, supra; Bannister, 95-0404 at p. 8, 666 So.2d at 647. The civil service commission’s factual findings should be given deference, with the reviewing court employing the manifest error/clearly wrong rule of review. Id. Thereafter, the reviewing court should evaluate the commission’s imposition of a particular disciplinary action to determine if it is both based on legal cause and is commensurate with the infraction; the court should not modify the commission’s order unless it is arbitrary, capricious, or characterized by abuse of discretion. Id. “Arbitrary or capricious” means the absence of a rational basis for the action taken. Id. “Abuse of discretion” generally results from a conclu *119 sion reached capriciously or in an arbitrary manner. Burst v. Bd. of Commissioners, Port of New Orleans, 93-2069, p. 5 (La.App. 1 Cir. 10/7/94), 646 So.2d 955, 958.
Generally, the burden of proof on appeal lies with the appointing authority. Banks v. Dep’t of Police, 10-1204, p. 4 (La.App. 4 Cir. 1/19/11), 56 So.3d 1090, 1093; Walters v. Dep’t of Police of New Orleans, 454 So.2d 106 (La.1984). However, when an employee makes a claim of discrimination by the appointing authority, the employee bears the burden of proving that his employer intentionally discriminated against him or her on the basis of race. Moore v. Ware, 01-3341, p. 14 (La.2/25/03), 839 So.2d 940, 950, citing St. Mary’s Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
| ^Additionally, Rule II, Section 4.3 of the Plaquemines Parish Civil Service Commission Rules states:
Where discrimination is alleged to be a basis for appeal, specific facts supporting the conclusion of discrimination must be alleged in detail. The specific facts required will vary depending on the nature of the appeal; however, the facts must be alleged in sufficient detail to enable the agency to prepare a defense. A conclusion of discrimination is not sufficient. The types of facts which must be included are:
a. The date, time, and the place the discriminatory action took place.
b. The name of the person or agency alleged to have taken the discriminatory action.
c. A description of how appellant’s action, conduct, or performance was the same as that of other persons who were treated differently.
d. The names of other persons treated differently and the dates the different treatment occurred.
e. A description of events, including the dates and circumstances thereof, which led appellant to believe that the adverse decision was based on the appellant’s religious or political beliefs, sex, race, or any other non-merit factor.
f. Persons alleging discrimination as a basis for appeal shall bear the burden of proof of their allegations.
After careful review of the transcript of the hearing and the exhibits attached, we find that the discipline administered, i.e., discharge from duties, is not commensurate with the infractions charged. We find the discharge of Parker to be arbitrary and capricious because the record does not indicate that the appointing authority met its burden of proving, by a preponderance of the evidence, that the infractions charged presented a real and substantial relationship to the operation of the appointing authority. We do not find, however, that Parker has met his burden of proving racial discrimination.
The record reflects there is no basis to discipline Parker as it relates to his wearing a t-shirt when working on the boat. A memorandum issued by Port [1sManager Pennison on September 28, 2011, indicates that “[i]t is permissible to remove your shirt [light blue shirts issued by Cintas with the Port Logo] working around the barge, dock....” The memorandum makes no mention of a t-shirt with a port logo. We understand that there is evidence that Parker was not cleaning the boat, but was rather sleeping/resting in his truck when Durr arrived, but the fact remains that there is no stated rule that the t-shirt must bear a port logo.
The remaining items for which Parker was disciplined were documented in the record, and corroborated by the testimony *120 of three witnesses: Durr, DiCarlo and Pennison. Parker does not dispute that the events took place; rather, he claims that he was terminated on the basis of his race and not for good cause shown.
We note that in the two prior disciplinary actions against Parker, he does not deny that he did any of the things for which he was disciplined. He does not deny that he questioned certain items listed on the drug screen, or that he complained about the conditions under which he was tested. He does not deny yelling at the staff person administering the test or that he threatened to call her supervisor for what he considered disparate treatment.
Parker voluntarily signed off on the disciplinary form when he was suspended for excessive personal use of his work cell phone. At the hearing, he testified that he knew what he did was wrong, and that the Port Authority was justified in disciplining him.
Relative to this last incident for which he was ultimately terminated, Parker does not deny that he called in sick five and one half hours prior to his shift, but |14later that same morning attended his son’s football game. Parker claims that he was on a break and was resting in his truck, inferring that he had been helping to clean the boat. He also argues that it was acceptable to wear a non-work issued t-shirt, as opposed to one purchased by the employee with the port’s logo on it, while performing work such as cleaning the boat. Lastly, Parker argues that it was not required that he produce his doctor’s excuse directly to his supervisor when asked. Parker does not deny calling his supervisor, Durr, a coward, but denies cursing him.
Part of the evidence presented by the appointing authority was a document which set forth the responsibilities and duties of rescue boat captains. Another document entered was one indicating that Parker read the rules and understood them. Basic duties described in the document included:
1) To obey all lawful commands.
4) To perform all duties in a seaman like manner.
5) To submit to normal discipline.
11. To report promptly to the Port Office the existence of any personal medical problems or injuries.
We find this document to be vague and to not contain the “rules” testified to by Durr and Pennison. Rather, both of the supervisors testified about unwritten rules of which they claimed everyone was aware. Parker testified basically that rules were lax and not enforced to the letter. Under our rules of review, we cannot make a judgment contrary to the commission’s regarding credibility, but the fact remains that the written rules do not set forth the procedures which the supervisors claim were to be followed.
| lsFor example, as stated above, the rules do not require that a t-shirt with the port logo be worn when cleaning the boat. The rules do not provide any specific protocol for calling in sick or for providing a doctor’s excuse. Rule 11 states that one should “report promptly to the Port Office the existence of any personal medical problem or injury.” Similarly, the alleged infraction for not answering simple questions regarding estimated time of departure is not covered in the rules. The rules state that the captain, before leaving the base, shall ensure that the boat is prepared for departure and shall verify this to the Port Office.
The more serious infractions, i.e., acting in an unprofessional manner by yelling at *121 and cursing his supervisor, are not disputed. Although Parker denies cursing his supervisor, his co-worker testified that he did. What Parker does not deny is yelling and calling his supervisor a coward, behavior that is unprofessional and should not be tolerated. However, when considering all of the proven infractions as a whole, and further considering the written responsibilities and duties of captains provided by the appointing authority, we find the discipline imposed to be arbitrary and capricious and not commensurate with the substantiated charges. The appointing authority did not meet its burden of proving, by a preponderance of the evidence, that Parker’s behavior impaired the efficient operation of the appointing authority. See Pearson, supra.
For these reasons, we reverse the decision of the Civil Service Commission discharging Roderick Parker and remand this matter for the Commission to impose a more appropriate penalty than dismissal from service.
AFFIRMED IN PART; REVERSED IN PART; REMANDED

. Although DiCarlo testified that he was promoted to captain in August of 2011, he testified that he was working as an engineer/deckhand on the day of this incident. He explained that he would only work as a captain if needed; otherwise, he was a deckhand.

. The hearing referenced by Parker was actually the initial hearing before the appointing authority.